# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CA-01403-SCT

*JOHNNY LEE WILLIAMSON, JR.*

*v.*

*MAVIS C. DANIELS*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/19/1997 |
| TRIAL JUDGE: | HON. JERRY O. TERRY, SR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WALTER W. TEEL |
| ATTORNEYS FOR APPELLEE: | HARRY R. ALLEN |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 10/07/99 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/28/99 |

### EN BANC.

### MILLS, JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. Johnny Lee Williamson, Jr. brought this suit in the Circuit Court of Harrison County, Mississippi, against Mavis C. Daniels seeking to recover damages for personal injuries suffered when he was shot in the chest by Daniels's 15 year-old son, Eddie Smith. Williamson's complaint alleges that Daniels was negligent in the supervision of her minor child and that her negligence was the proximate cause of his injuries. At the conclusion of the evidence introduced on behalf of the plaintiff below, the defendant moved the court for a directed verdict. The circuit court judge, finding that the acts of Eddie Smith constituted at least an independent, intervening cause of the plaintiff's injuries as related to any potential negligence on the part of the defendant, sustained the motion for a directed verdict, and judgment was accordingly entered dismissing the suit of the plaintiff. From that judgment, Williamson prosecutes this appeal asserting the following as error:

> **I. WHETHER THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE OF A YOUTH COURT CURFEW IMPOSED UPON DEFENDANT'S SON.**
>
> **II. WHETHER THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT IN FAVOR OF THE DEFENDANT.**

### STATEMENT OF FACTS

¶2. The injuries sustained by Williamson were inflicted on April 12, 1993, at which time Eddie Smith was

fifteen years of age and living with his mother, Daniels. Sometime between 8:00 p.m. and 8:30 p.m. on the evening in question, Eddie answered the phone at his mother's house. The call was from Daniels's supervisor at GCCAA Head Start Agency, where Daniels works as teacher. While Daniels was on the phone in her room, Eddie left the house.

¶3. Williamson at this time was visiting his girlfriend, Trina Johnson, who lived a short distance down the street from Daniels. According to his testimony, the alarm on Johnson's car was activated, and Williamson left the house to investigate. The evidence suggests that Eddie and two other boys set off the alarm by throwing a ball at the car. When Williamson went outside, he was confronted by Eddie. Following a verbal exchange, Eddie produced a gun and shot Williamson, who was unarmed. Williamson sustained a gun shot wound to the chest which left him paralyzed from the waist down.

¶4. At trial, Daniels testified that on the night Williamson was shot, Eddie left the house without her knowledge and permission and that she was still on the phone with her supervisor when a neighbor came to the door to tell her that Eddie had shot someone. She further stated that she had no knowledge that Eddie possessed a handgun and that she had, at all times prior to this incident, specifically forbade the use and/or possession of such weapons. According to Daniels, she asked Eddie after the shooting where he had acquired the gun; he replied that he and another boy from the neighborhood had found it and kept it hidden in his room.

¶5. At the time of the shooting, Eddie was subject to a curfew prescribed by the youth court after he struck a boy at school. It required that Eddie be inside his house by 7:30 p.m. from Sunday through Thursday and by 10:00 p.m. on Friday and Saturday nights. Daniels testified that she made every effort to enforce this curfew and that she knew of only one other curfew violation prior to the night of the shooting. Williamson, to the contrary, testified that, although he was not personally acquainted with Eddie, he had repeatedly seen him out on the street after midnight.

¶6. Daniels admitted that Eddie had been in trouble a number of times prior to the assault on Williamson: He struck a boy at school rendering him unconscious. He had a fight with his uncle, during which he inflicted a minor wound upon his uncle's hand with a knife. He dropped out of school, complaining that the teachers were picking on him. A complaint was filed against Eddie for allegedly threatening to shoot a ten year old girl with a pellet gun, although Daniels testified without contradiction that she investigated the complaint and ascertained to her satisfaction that Eddie had not been the one who threatened the girl. There is also some evidence that Eddie left the house one night while his mother was sleeping and acted as the lookout for a robbery of the Hudson's Salvage Center in Gulfport; he was picked up by the police in conjunction therewith but was not prosecuted. Daniels testified that for each of the above offenses she attempted to discipline her son by grounding him, taking away his video games, and applying corporal punishment. She testified further that, when Eddie dropped out of school, she often took him to work with her and had him clean up around the school so that she could watch him. She also took Eddie to Gulf Coast Mental Health in Gulfport for a brief period of time for counseling.

## DISCUSSION

### I. WHETHER THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE OF A YOUTH COURT-IMPOSED CURFEW.

¶7. Williamson complains that the trial court erred in excluding evidence of the curfew order imposed

against Eddie Smith by the youth court. He argues that the curfew order, which resulted from a fight Eddie had at school, was demonstrative of a violent and vicious nature and that Daniels, as she was present when the curfew was imposed, had notice of such. In this capacity, Williamson urges, the evidence was more probative than prejudicial and, therefore, should have been admitted.

¶8. This Court has long held that "[t]he admission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion." *Sumrall v. Mississippi Power Co.*, 693 So. 2d 359, 365 (Miss. 1997) (*quoting General Motors Corp. v. Jackson*, 636 So. 2d 310, 314 (Miss. 1992); *Walker v. Graham*, 582 So. 2d 431, 432 (Miss. 1991)). The court below in considering whether evidence of the curfew order should be admitted, found the following:

> [T]he curfew order is an issue that would be misleading to the jury unless they were instructed that the curfew was not binding upon Ms. Daniels as a legal obligation to enforce it... The only potential value that these orders have would be for the purpose of giving notice to the parent that the child has been found to be delinquent by a judicial authority.

¶9. It is apparent that the trial judge balanced the potential probative value of the curfew order against its prejudicial effect under Mississippi Rule of Evidence 403, which states in part that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." We find, as the trial court did, that the curfew order was of limited probative value in that it demonstrated only that Daniels was aware that her child had been adjudicated delinquent, a fact not seriously in dispute. At the same time, the evidence posed a substantial risk of misleading the jury in that it implied that Daniels owed a duty greater than that which all parents have to control their minor children; namely, that she had a *legal* duty to enforce the youth court's orders. We cannot say that the trial judge's decision to exclude the curfew order was an abuse of discretion. For the foregoing reasons, we find this assignment of error to be without merit.

## II. WHETHER THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT IN FAVOR OF APPELLEE.

¶10. Williamson also complains that the trial court erred in sustaining Daniels's motion for a directed verdict and dismissing his case. "This Court conducts a *de novo* review of motions for directed verdict. If the Court finds that the evidence favorable to the non-moving party and the reasonable inferences drawn therefrom present a question for the jury, the motion should not be granted." *Little v. Bell*, 719 So. 2d 757, 760 (Miss. 1998)(*quoting Pace v. Financial Sec. Life of Mississippi*, 608 So. 2d 1135, 1138 (Miss. 1992)). Therefore, unless the evidence presents a question of fact over which reasonable jurors could disagree, a motion for directed verdict should be sustained. *Id*. (*quoting Vines v. Windham*, 606 So. 2d 128, 131 (Miss. 1992).

¶11. Williamson's claim involves the question of the liability of parents for the intentional or malicious acts of their minor children. Mississippi has long adhered to the general rule that a parent will not be held liable for the tortious acts of its minor child on the mere ground of the parental relationship. *Tatum v. Lance*, 238 Miss. 156, 161, 117 So. 2d 795, 797 (1960) (*quoting Dempsey v. Frazier*, 119 Miss. 1, 80 So. 341, 342 (1919)); *Winn v. Haliday*, 109 Miss. 691, 69 So. 685 (1915). There are, of course, exceptions to this rule. In addition to the common law cause of action for negligent supervision, the Mississippi Legislature, in keeping with the majority of states, has enacted statutes which make even non-negligent parents, in certain limited circumstances, liable for the malicious and willful acts of their children. See Miss.

Code Ann. § 93-13-2 (1994) and Miss. Code Ann. § 43-21-619 (1993).

¶12. Williamson cites *In the Interest of B.D.,* 720 So. 2d 476 (Miss. 1998), in support of his claim for recovery. In that case, this Court upheld the constitutionality of § 43-21-619 empowering youth courts with the discretion to impose damages or restitution against parents for the willful or malicious acts of their children regardless of parental negligence. *B.D*. at 481. Williamson's reliance on § 43-21-619, however, is misplaced as the statute is applicable only to the youth court. "It is the Legislature's intent that [restitution] be accomplished through the youth court instead of the circuit court. It is not this Court's place to negate such a decision because we might prefer a different procedure." *B.D.* at 479. Being without other remedy, Williamson relies on common law, which is inadequate for deciding the present case and emerging legal theories on the issue.

¶13. Under common law, parents can be liable for their children's acts "where the parents [own] negligence has made it possible for the child to cause the injury complained of and probable that the child would do so."*Tatum*, 238 Miss. at 162, 117 So. 2d at 797 *(quoting* 67 C.J.S. *Parent and Child* § 68, p. 798). This is the cause of action known as negligent supervision, and it is based on the simple premise that parents have a societal duty to exercise reasonable care in the supervision of their minor children so as to prevent them from intentionally injuring others.

¶14. In the case *sub judice*, Williamson alleges that Daniels failed to reasonably supervise her 15 year old, and this negligence was the proximate cause of his injuries. An actionable claim of negligent supervision, as is the case with all negligence claims, requires that the plaintiff establish the existence of a duty of care, a breach of that duty, proximate causation, and compensable damages. Each element must be satisfied. This requires not only that the plaintiff show negligence and injury, but that the injury sustained by the plaintiff was a reasonably foreseeable consequence of the defendant's negligence.

> The rule is firmly established in this state, as in nearly all the common law states, that in order that a person who does a particular act which results in injury to another shall be liable therefor, the act must be of such character, and done in such a situation, that the person doing it should reasonably have anticipated that some injury to another will probably result therefrom, . . . but that the actor is not bound to a prevision or anticipation which would include an unusual, improbable, or extraordinary occurrence, although such happening is within the range of possibilities.

*Mauney v. Gulf Ref. Co.*, 193 Miss. 421, 427-28, 9 So. 2d 780 (1942)(citations omitted).

¶15. It follows therefrom that parents have a duty to take reasonable measures to supervise their children so as to protect others from acts of their children which are reasonably foreseeable. Other courts have faced this question in similar circumstances. *See, e.g.*, *Dinsmore-Poff v. Alvord*, 972 P.2d 978 (Alaska 1999); *Barth v. Massa*, 558 N.E.2d 528 (Ill.App.Ct. 1990); *Duncan v. Rzonca*, 478 N.E.2d 603, 612 (Ill.App.Ct. 1985); *Prather v. Brandt*, 981 S.W.2d 801, 806 (Tex.App. Houston 1st Dist. 1998).

¶16. The Restatement (Second) of Torts § 316 has attempted to clarify the common law as it pertains to the liability of parents for the willful or malicious acts of their children by imposing upon parents

> a duty to exercise reasonable care so to control [one's] minor child as to prevent it from intentionally harming others or from so conducting itself as to create an unreasonable risk of bodily harm to them, if the parent

(a) knows or has reason to know that he has the ability to control his child, and

(b) knows or should know of the necessity and opportunity for exercising such control.

Under § 316, the duty to take reasonable measures to control the child arises when the parent knows or should know of the need to control the child and has both the ability and the opportunity. In other words, the parent must actually be capable of controlling the child as well as aware of a specific need to do so. Although we do not find it necessary at this time to adopt the Restatement's version of parental liability, we find it helpful in analyzing such claims.

¶17. Both the Restatement (Second) of Torts § 316 and the general common law principles of negligence regarding parental supervision of the minor child suggest that the parent must have knowledge of prior malicious acts similar enough to the specific act complained of to put the parent on notice of the necessity to control the child. The parent will be charged with the knowledge of such acts as would be discovered in the exercise of reasonable supervision. The parent must also have failed to act as a reasonably prudent parent would to control the child's behavior so as to prevent a recurrence. We think it important to note that the mere fact that the parents failed to control the child is insufficient to prove negligence; they must have failed to act as reasonably prudent parents based on notice of the child's propensity to do harm.

¶18. In *Dinsmore-Poff*, the Alaska Court recognized that parents have a duty to act reasonably in preventing the torts of their minor children where the parents have notice of the child's dangerous propensities. 972 P.2d at 981. Parents are on notice of their child's dangerous propensities and the need to impose corrective measures if they know of similar past conduct. *Id*.

¶19. More recently, in *Tatum v. Lance*, we found that where parents exercised due care to prevent inappropriate use of a BB gun, they were not liable for injuries their son inflicted on another child. In *Tatum*, no proof was elicited to show that the child had a vicious or violent nature, and we found that, given the circumstances, the parents could not have foreseen the injury. We posited:

> The further question is whether or not the parents of the Lance child as reasonably prudent persons should have reasonably foreseen or anticipated that the maid in the Lance home would be sick, that it would become necessary for Mrs. Lance to take her to a doctor, and that Mr. Lance, who had gone for his child at the school, would miss the bus, and that during such interval the Lance child would be left in the home alone, and that he would search the house for the shots which his father had concealed therein and would succeed in locating the same, and then use the gun to the injury of another.

238 Miss. at 162-63, 117 So. 2d at 798.

¶20. In the case at hand, Williamson contends that Daniels had full knowledge of her son's propensity towards violence. In support of this claim he cites specific instances of Eddie's prior misconduct of which Daniels was aware; namely, that he struck a boy at school, he cut his uncle's hand during a fight, he was accused of bullying neighborhood children, and he apparently participated to some extent in a robbery. In light of Eddie's pattern of behavior, there were sufficient facts available for a jury to conclude that Daniels was on notice that her child had a tendency for violence towards others. This was a sufficient preliminary finding to impute parental liability upon Daniels for the conduct of her child Eddie.

¶21. Assuming that Eddie's prior acts imputed notice of his dangerous propensity to Daniels, the analysis

can not stop there. Once it is determined that parents had notice of their child's dangerous propensities, the next step is to determine whether the parents acted reasonably in controlling the child. ***Dinsmore-Poff*** set out four factors to be considered: (1) the appropriateness of the parent's response to specific acts of prior violence; (2) the reasonableness of subsequent general efforts to control the child; (3) whether the parents should have foreseen the need to prevent the specific incident at issue; and, if so, (4) the reasonableness of the parent's efforts to do so. 972 P.2d at 985.

¶22. As to whether the parents appropriately responded to prior violent acts, ***Dinsmore-Poff*** noted that most courts "have been far from demanding in judging the reasonableness of parental efforts to correct a vicious tendency; it is enough that the parents make a good faith effort to correct wrongdoing as it occurs." ***Id.*** at 982, 983. The parents must also make such subsequent reasonable general efforts to control the child and prevent a recurrence of a violent episode. ***Dinsmore-Poff***, 972 P.2d at 982, 985. The court in ***Barth v. Massa***, *supra*, held that parents need only exercise such ability in controlling their child as they in fact have when the opportunity of exercising such authority arises and they know the necessity of doing so. 558 N.E.2d at 534. (citing Restatement (Second) of Torts § 316 (1966), cmt. b.). Additionally, parents are more likely to be effective in controlling a young child as opposed to a near-adult child. ***Dinsmore-Poff***, 972 P.2d at 982 (citing ***Moore v. Crumpton***, 295 S.E.2d 436, 442 (N.C. 1982); ***Bell v. Hudgins***, 352 S.E.2d 332, 334 (Va. 1987)).

¶23. The parents in ***Dinsmore-Poff***, who failed to search their child's personal effects or enforce a curfew, in spite of the fact that they knew of a prior assault with a stolen gun, were found to have acted reasonably. The parents resorted to numerous psychiatric treatment facilities, restrictive school programs and cooperated with the child's probation officer. ***Id.*** at 979. In the similar facts of this case, Daniels testified that when fifteen year old Eddie acted inappropriately, she used corporal punishment and withheld privileges. Additionally, she sought psychiatric help for Eddie and took him to work with her or left him with relatives in an effort to assure that he was properly supervised at all times. These actions should be viewed in the context of what Daniels knew about the incidents. The knife incident was described by her brother, the victim, as not being very serious, and there were conflicting stories about the fight at school.

¶24. Viewing all the evidence in favor of Williamson, even if it was found that Daniels did not effectively enforce the curfew, such a finding would not subject Daniels to liability in light of her other efforts in attempting control of Eddie. ***See Dinsmore-Poff***, 972 P.2d at 987. More importantly, in order to attach liability to parents, it must also be shown that the parents foresaw the need of preventing the specific incident, otherwise parents would effectively become insurers and prison wardens for their minor children. ***Id.*** It is not enough to show that, based on prior misconduct of the child, the parents had general notice of the child's dangerous propensity. Nor is it sufficient that there is a jury issue regarding whether the parental response to that knowledge was "reasonable." There must also be a showing that the parents had reason of knowing with some specificity of a present opportunity and need to restrain the child in preventing some imminently foreseeable harm. ***Dinsmore-Poff***, 972 P.2d at 986.

¶25. In ***Barth v. Massa***, 558 N.E.2d 528 (Ill.App.Ct.1990), a fifteen year old child brought stolen guns, hid them in his room and later used one of them during a burglary to shoot a police officer. The officer sued the minor's parents claiming that they failed to take proper responsibility of the child's prior violent acts which involved shooting at other children with a BB-gun. The ***Barth*** court held that in spite of the fact that the parents knew of the BB-gun incident, they did not have the requisite notice of their son's propensity to perform the far more dangerous felony. That is, they knew nothing of the stolen guns or any of the child's

thoughts concerning burglary or other criminal conduct.

¶26. In the present case, Daniels presented uncontradicted testimony that she was not aware of the fact that Eddie obtained a gun from a friend and had hidden it in his bedroom, contrary with her rules against guns; or that Eddie had left the house while she was on the phone; or that when he left the house he was carrying a gun; or that he had any reason or desire confront Williamson and shoot him. The factually analogous case of *Barth* shows that charging Daniels with knowledge of a need to take additional precautions in preventing Eddie from shooting Williamson would be unreasonable under these circumstances. See *Tatum*, 238 Miss. at 162-63, 117 So.2d at 798.

¶27. We think it unreasonable to require parents to anticipate and guard against every logically possible instance of misconduct. Extending the zone of foreseeability so far as to include Williamson's claim would pose the risk of transforming parents from care givers and disciplinarians into the jailors and insurers of their minor children. We think this is a role most parents are ill equipped to take on.

¶28. We in no way suggest that parental liability for the criminal acts of the minor child is always precluded. *Cf*. Miss. Code Ann. §§ 97-13-14 &-15 (1994) (subject to some exceptions, parent is guilty of a misdemeanor if parent knowingly suffers or permits child under 18 years of age to have, own, or carry concealed any weapon the carrying of which concealed is prohibited). We can imagine a number of situations where parents, having actual notice of a specific vice and failing to take reasonable steps to prevent its recurrence, would incur civil liability for their child's criminal acts or intentional torts. In this instance, however, we can find no evidence of any prior misconduct similar enough to the attack on Williamson to alert Daniels that an assault of this nature was imminent.

¶29. In conclusion, we find that the plaintiff below proffered insufficient evidence to create a jury issue on the question of foreseeability. The order of the Circuit Court of Harrison County granting the defendant's motion for directed verdict and dismissing the case is, therefore, affirmed.

¶30. **AFFIRMED.**

> **PRATHER, C.J., PITTMAN, P.J., BANKS, SMITH, WALLER AND COBB, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J.**
>
> McRAE, JUSTICE, DISSENTING:

¶31. Because there were sufficient facts to make out a jury question as to whether Ms. Daniels was negligent in supervising her son, I would reverse the trial court's directed verdict for the defendant.

¶32. The majority opinion is correct in that parents are not liable for the intentional acts of their children based solely on the parent-child relationship. However, a parent may be liable for injuries inflicted by her child where those injuries are the foreseeable result of the parent's own negligent supervision. *Tatum v. Lance*, 238 Miss. 156, 161-62, 117 So. 2d 795, 797, 798 (1960). The Restatement (Second) of Torts § 316 (1965) puts it this way:

> A parent is under a duty to exercise reasonable care so to control his minor child as to prevent it from intentionally harming others or from so conducting itself as to create an unreasonable risk of bodily harm to them, if the parent

(a) knows or has reason to know that he has the ability to control his child, and

(b) knows or should know of the necessity and opportunity for exercising such control.

¶33. In this case, there was a plethora of evidence that Ms. Daniels knew she needed to exercise control over her son. Ms. Daniels was aware that her son Eddie Smith had dropped out of school in the ninth grade; that at the age of fourteen he had struck a boy at school rendering him unconscious and requiring the boy to go to the hospital; that Eddie had gotten into an argument with his uncle, picked up a kitchen knife and wounded him; that he was known to bully neighborhood children; and that he had participated with some friends in the burglary of a store[1]. She was also aware that her son had been adjudicated a delinquent by the youth court and was given a curfew of 7:30 p.m. on week nights and 10 p.m. on Friday and Saturdays. Although Ms. Daniels stated that she did not allow her son to have a gun, she was unaware that Eddie had hidden a gun in his bedroom for some period of time prior to the shooting. Ms. Daniels testified that she knew she needed to watch over Eddie after he was taken to youth court for hitting a boy at school.

¶34. These facts are more than sufficient to satisfy part (b) of the Restatement (Second) test that Ms. Daniels knew of the necessity for exercising control over her son. That being the case, the only question is whether there was sufficient evidence to make out a jury question on whether Ms. Daniels made reasonable efforts to control her son.

¶35. The evidence shows that Ms. Daniels had her son treated at Gulf Coast Mental Health for a short period of time after he dropped out of school. While Ms. Daniels worked, Eddie was either helping her at work (Head Start), stayed at his grandmother's or was wandering in the neighborhood. Ms. Daniels testified that her son had violated the court-imposed curfew only once prior to the shooting and that was when he and his friends burglarized Hudson's.

¶36. Ms. Daniels testified that she was "watching [Eddie] the best I could." She would punish him for his misdeeds by whipping him and not allowing him to play video games. On the night of the shooting, Eddie slipped out between 8:00 and 8:30p.m. (which was after his 7:30 curfew) while Ms. Daniels was on the phone.

¶37. The victim, Johnny Williamson, testified that while he did not know Eddie Smith, he had seen Eddie Smith many times out after 7:30 p.m. on week nights unsupervised by his mother.

¶38. This Court conducts a de novo review of motions for directed verdict. If the evidence viewed in the light most favorable to the party opposing the motion (as well as all the reasonable inferences drawn therefrom) presents a question for the jury, the motion should not be granted. *Pace v. Financial Sec. Life of Mississippi*, 608 So.2d 1135, 1138 (Miss.1992). A directed verdict should be granted only if the facts are so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary conclusion. *General Motors Acceptance Corp. v. Baymon*, 732 So.2d 262, 267 (Miss. 1999); *McMillan v. King*, 557 So.2d 519, 522 (Miss.1990).

¶39. As stated above, there is no question but that Williamson presented sufficient evidence on the issue of whether Ms. Daniels knew her son was in need of close supervision. Indeed, Ms. Daniels admitted as much. There was also sufficient evidence to make a jury question on the issue of whether Ms. Daniels, after concluding that her son needed supervision, took reasonable steps to control him. As she herself testified,

her only efforts in this direction appear to have been the occasional whipping and denial of access to video games. There was evidence that despite these punishments, and despite the court-imposed curfew, Eddie Smith was roaming the streets and, on occasion, committing criminal acts in the company of other delinquents.

¶40. The jury may well have concluded that Ms. Daniels's efforts were enough. However, reasonable jurors may just as easily have concluded otherwise. The standard of review requires that the jury should have been given the opportunity to decide this question.

¶41. I also write to say that I am mystified at the majority's discussion concerning the curfew evidence. I disagree with the majority's conclusion that the trial court would not have committed error in disallowing this evidence. Evidence of the curfew was relevant to show that Daniels knew that she needed to supervise her child.[2] As noted in **Dinsmore-Poff v. Alvord**, 972 P.2d 978 (Alaska 1999), the case cited by the majority, "courts first ask if parents knew of past conduct enough like that at issue to put them on notice of the need to correct their child's dangerous propensity." **Dinsmore-Poff**, 972 P.2d at 981.

¶42. However, the majority's handling of this issue is confusing in that the trial court never excluded evidence of the curfew, and, indeed, evidence of the curfew was adduced throughout the trial. Instead, the trial court, in discussing the directed verdict, indicated that while the evidence of Eddie's curfew was probative of Ms. Daniels's knowledge that Eddie was a delinquent, it was not to be considered as evidence of a legal obligation on Ms. Daniels. Legally obligated or not, the fact that Ms. Daniels was unable to keep her son in the house in accordance with the curfew was certainly evidence relevant to whether Ms. Daniels's exercised reasonable control of her son.

¶43. Furthermore, I think there is an argument to be made that the family court order imposing a curfew on Eddie placed an obligation on Eddie's mother to enforce the curfew.

¶44. Because the court order imposed conditions on Eddie's ability to leave his house, Ms. Daniel's was Eddie's *de facto* jailor. In a certain sense, Ms. Daniels' was in a position similar to that of the parole board or the Mississippi Department of Corrections. If Ms. Daniels felt that she was not up to the job of making her child abide by the conditions of his probation, she should have informed the court which could have made other provisions concerning the delinquent child. Her failure to do so meant that she accepted the obligation of supervising her son in accord with the court's order.

¶45. The family court could have placed Eddie in a youth detention facility. Instead, the court sentenced Eddie to the juvenile equivalent of house arrest with Ms. Daniel's acting as Eddie's "ankle bracelet". Who else other than Ms. Daniels was in a position to insure that Eddie abided by the order? As Eddie's guardian and the only adult with whom he lived, Ms. Daniel's was the only person in a position to see to it that Eddie obeyed the provisions in the order including the curfew. Ms. Daniels was no doubt happy that her son was not taken from her home and placed in detention. However, she was well aware her son had been violent in the past and her acquiescence in the order placing an adjudicated delinquent in her home did not come without certain responsibilities. The order stated that "violation of the rules of probation shall result in the minor child being brought before the Court for further consideration and to determine whether minor's probation should be revoked." At the very least, then, if Ms. Daniels was unable to supervise her son to the extent required by the order, and Eddie violated the terms of his probation, Ms. Daniels had an obligation to report Eddie's violations to the court or Eddie's counselor so that other arrangements could be made.

¶46. Finally, I disagree with the majority's proscription against persons injured by minors from seeking restitution in courts other than the youth courts. There is no justification for limiting restitution to youth court especially given that our rules contemplate that a party should be entitled to obtain all the relief to which he is entitled in a single action. *Matter of Estate of McClerkin*, 651 So.2d 1052, 1058 (Miss. 1995). Furthermore, the requirement that these cases be brought in youth court, a court that sits without a jury, violates the right of the injured party to have a jury determine the amount of damages. Mississippi Constitution Art. 3, §31; *Odom v. Roberts*, 606 So.2d 114, 119 (Miss.1992). Is the majority saying that because this paralyzed boy's lawyer filed suit in circuit court, and not the youth court, he is precluded from getting restitution? In *In Interest of B.D.*, 720 So.2d 476 (Miss. 1998), we allowed an insurance company to seek restitution of almost $20,000 in property damages in the youth court. But is it not the better course to have cases in which substantial restitution is sought to be tried in the circuit court, a court that not only has original jurisdiction over the case but also accords the parties their constitutional right to trial by jury? I can see no reason for the majority's conclusion that restitution cases may only be brought in youth court.

¶47. For all of these reasons, I dissent.

**SULLIVAN, P.J., JOINS THIS OPINION.**

1. The friends had been spending the night with Eddie when they burglarized Hudson's Salvage Store. Eddie violated his curfew on this occasion.

2. The fact that youth court records are ordinarily confidential matters not. See e.g., *Daniels v. Wal-Mart Stores, Inc*, 634 So.2d 88 (Miss. 1994) (defendant accused of slandering youth by calling him a shoplifter was entitled to put on evidence that plaintiff had been adjudicated delinquent for shoplifting by youth court).