MAIN, Justice.
Jim Cody Beddingfield and his parents, Jimmy Larry Beddingfield and Rebecca M. Beddingfield, the defendants in this action, appeal from a judgment entered on a jury verdict in favor of Trace Rex Li-nam, the plaintiff in this action, and from the trial court’s order denying their post-judgment motion for a judgment as a matter of law (“JML”) or for a new trial. We reverse, render a judgment in part, and remand.
*1180 I. Factual Background and Procedural History
On July 2, 2004, Jimmy Larry Bedding-field (“Larry”) and his wife Rebecca M. Beddingfield (“Becky”) were preparing for a family reunion and Fourth of July celebration to be held at their house on Lake Guntersville on the following day.[1] Larry and Becky’s son, Jim Cody Beddingfield (“Cody”), who was then 14 years old, had come to the lake house that day with his parents. Larry’s nephew, Jeff Bedding-field (“Jeff’), also had come to the lake house on July 2 to handle the task of cooking the barbecue to be served at the party. Jeffs wife, Lisa Beddingfield (“Lisa”), was to arrive the following day with their children. However, because Cody was at the lake house on July 2, Lisa drove there on July 2 from Huntsville to drop off her son, Jay Malone (“Jay”), who was then 14, and his friend, Trace Rex Linam (“Trace”), who was then 15. Jay and Trace were best friends and had known each other since the first grade. Jay had known Cody since Jeff and Lisa had married several years before. The three boys, who had spent time together on two previous occasions, planned to “hang out” at the lake while Larry, Becky, and Jeff prepared for the approximately 75-100 people who were expected at the lake house the following day.
Jay and Trace testified that they saw Becky, Larry, and Jeff when they arrived or shortly thereafter. Lisa and Jeff testified that Becky took Lisa on a tour of the house that lasted approximately 15 minutes, after which Lisa left. Jay and Trace testified that they had lunch with Cody and then the three boys went fishing for awhile. All three boys testified that they then came back to the house and found a large pile of fireworks on a porch at the back of the house. The boys said that there were M-80s, artillery shells, a big cannon, and approximately 500 bottle rockets in the pile. None of the adults who testified at trial or the boys testified that he or she had bought the fireworks, knew that the fireworks were on the back porch, or knew how the fireworks had come to be on the back porch.[2] The boys took bottle rockets and M-80s to the dock on the lake, where they began lighting the fireworks and throwing them toward the lake.[3] Trace and Jay testified that they had shot fireworks before, including bottle rockets, but Trace said that he had never shot them without adult supervision. Cody testified that he had never shot bottle rockets *1181 before shooting them with Trace and Jay on July 2. It is undisputed that there was no adult supervision on this occasion.
After the three boys shot bottle rockets for about an hour, Trace and Jay testified, Trace went back to the house to use the restroom or to get a drink of water. As Trace came back outside and walked down a hill toward the dock, he stopped on the grass on the shore to tie his shoe. As he was bent over, he said, he heard a whistling noise and, immediately thereafter, something hit his left eye so hard that he was knocked down. Trace said his eye was burning and began bleeding and that he began screaming. He said he immediately lost vision in his left eye. Trace stated that “the last thing I saw with my two eyes was Cody and Jay standing there, and Cody had his arm out.” Jay and Cody said that after the bottle rocket hit Trace, they ran to him and took him inside the house. Trace stated that once they were in the house, “Cody said he didn’t want to get in trouble and just to say it was just an accident.” Jay ran to get his stepfather Jeff, who looked at Trace’s eye and had him put ice on it. Jeff recognized that Trace’s eye injury was serious, so he telephoned Trace’s parents, Charles Gary Linam (“Gary”) and Beverly Linam (“Beverly”), and told them Trace had been injured and that he was going to take Trace to the hospital. Jeff said he asked Gary and Beverly where they wanted him to take Trace. Gary and Beverly told Jeff to take Trace to Huntsville General Hospital, and Jeff got in his vehicle with all three boys. Gary and Beverly met Jeff and the boys at the hospital.
Jay’s testimony about the events surrounding Trace’s injury was similar to Trace’s testimony. In response to questions from Trace’s attorney, Jay testified as follows:
“Q. Was Trace injured by a bottle rocket at some point?
“A. Yes.
“Q. Where were you when that injury occurred?
“A. I was on the dock.
“Q. Where was Cody Beddingfield?
“A. He was right next to me on the dock.
“Q. And where was Trace?
“A. He was on the shore, right where the dock started.
“Q. Tell us what happened?
“A. Cody, he lit a bottle rocket and pointed it at Trace and shot it at him. “Q. Let’s talk about that. Can you describe for the jury, what you — did you see this happen?
“A. Yes.
“Q. Describe for the jury what you saw, what Cody Beddingfield did.
[[Image here]]
“A. Okay. He lit it in his hand like that and then pointed it, then shot it.
“Q. Okay. Who did he point it at?
“A. At Trace.
“Q. What was the position of Trace when he was struck by the bottle rocket immediately before he was struck?
“A. He was kneeling over. I think he was tying his shoe or something like that. I don’t really remember.
“Q. Did you observe whether Trace was looking at Cody Beddingfield then or you then?
“A. No, he wasn’t.
“Q. Was he lighting a bottle rocket when he was struck, was Trace?
“A. No.
“Q. Did Cody Beddingfield say anything to you immediately before he aimed, lit and shot that bottle rocket at Trace?
*1182 “A. Yes, he just said, hey, watch this.
“Q. Hey, watch this?
“A. Yeah.
[[Image here]]
“Q. All right. Now, did he give any warning to Trace whatsoever that he was about to shoot and aim a bottle rocket at him?
“A. No.
“Q. He didn’t yell out anything?
“A. No.
“Q. When he said, hey, watch this, was that a volume that, your understanding that for you just to hear?
“A. Yes.
“Q. Did he hit his target?
“A. Yes.”
Jay said that, upon impact, Trace screamed “my eye, my eye.” Jay said he and Cody thought Trace was joking at first but quickly realized that Trace was badly hurt. Jay also said that after the boys reached the house, Cody asked him “if we would just tell everyone that he threw it up in the air and it came down and hit him.” Jay said he agreed at that time so Cody would not get in trouble. Later, however, Jay stated that he told the truth about how Trace’s injury occurred. On cross-examination, he testified:
“Q. Now, I believe you told me as far as this incident or this description of events that you’ve told us about, that you were asked if you had later told some adults about the story that you say Cody suggested. Who were those adults?
“A. At first, I just told my mom and my stepdad.
“Q. When did you tell them?
“A. I don’t remember.
“Q. It was some time later, wasn’t it?
“A. Right.
“Q. You never did tell anything like that to Becky or Larry, did you?
“A. No.
“Q. In fact, I think you agreed with me that at the time I took your deposition, that would have been the first time they would have ever heard that from you?
“A. Right.”
Jay also stated on cross-examination that on the previous occasions when he and Cody had been shooting bottle rockets, Larry and Becky were not with them. Jay said he did not know whether Cody’s parents knew the boys had been shooting bottle rockets or that Cody had been aiming the bottle rockets at cows. Jay said that, at the lake house on July 2, the boys did not talk to Larry or Becky about the fireworks and that none of the boys asked permission from any of the adults present to shoot the bottle rockets.
Cody’s recollection of the incident differed from Trace and Jay’s. He testified that he lit a bottle rocket and threw it as Trace was bending over to tie his shoe. Cody said that he did not point the bottle rocket at Trace, that he did not intend to hit Trace, and that hitting Trace with the bottle rocket was an accident. He denied asking Trace and Jay to say that Trace’s injury was an accident, but he said that he told Jeff on the day it happened that it was an accident. Cody also stated that as Jeff drove to the hospital, Cody “repeated over and over [to Trace] how sorry I was and how big of an accident it was, and I didn’t mean to hurt him.” Cody further testified, in response to questions from his attorney, as follows:
“Q. Now, am I correct, and correct me if I am wrong, am I correct that your explanation of the bottle rocket episode was the bottle rocket essentially misfired or went the wrong direction?
“A. Yes, sir.
*1183 “Q. Is that the understanding that your parents would have had that day?
“A. Yes, sir.
“Q. Do you know that they ever heard any other explanation before the deposition of Jay Malone that was taken a little over year or two ago?
[[Image here]]
“A. No, they didn’t.”
It is undisputed that none of the adults present at the lake on July 2 were aware that the boys were shooting bottle rockets until after Trace was injured. Jeff testified that he was involved with digging the pit he needed for the barbecue, which was on the opposite side of the house from the dock where the boys were, and said that he did not hear any fireworks. Jeff stated that he was having trouble getting the fire started because, he said, some of the wood appeared too green, so Larry left and went about a mile away to cut more firewood. Larry said he heard faint popping noises during the hour or so he was in the woods getting firewood, but he stated that he never saw fireworks at the lake house and did not know the boys were shooting them. After she showed Lisa around the house, Becky left and drove into town for groceries and other items she needed for the party. Both Larry and Becky returned to the house just as Jeff was preparing to leave for the hospital with the boys. Neither Larry nor Becky recalled seeing Trace arrive at the house, and neither was aware that he had been injured before seeing him in Jeffs vehicle with Cody and Jay.
Gary and Beverly met Trace in the emergency room of Huntsville General Hospital, where his eye was treated, and he was sent home. He then began seeing ophthalmologists in Huntsville and Birmingham in an effort to repair the damage done by the bottle rocket and to restore sight to his eye. However, only some of the damage could be repaired, and his sight could not be restored. Trace is legally blind in his left eye; he has a permanent disability of 100% to his left eye. He has been assigned a 41% permanent vocational loss as a result of the injury. Trace has had seven surgical procedures on his eye, including a laser surgery, a retinal-detachment repair and silicon-strip implant, a transpears plana vitrectomy, a retinal repair and cataract removal, a glaucoma shunt implant, the removal of the glaucoma shunt, and a deep sclerectomy implant. Trace’s left eye is permanently scarred and deviates outward toward his left ear, and he has glaucoma and double vision in his left eye. At the time of trial, his medical expenses totaled $101,378.03.
Trace testified as to the severe pain he has endured following the injury and the various surgical procedures he has undergone. He described how the injury to his eye has affected his life, including how high school was difficult for him because of his vision problems. He stated that his eye injury made it more difficult to do schoolwork and affected his relationships with other people. Trace said he felt “a lot different, and I lost something.” He also said that “everybody would look at me different.” He further described how his injury had affected how he felt about himself and how being around other people was difficult because of the disfigurement of his eye. Trace had played several sports before the accident and had planned to continue playing sports in high school, but after his eye was injured he was no longer able to participate in any kind of sports activity. He was able to graduate from high school, but at the time of trial he had not taken many college classes and had not yet decided on a potential career path. Trace said he still had hope that he could find a doctor who could at least improve his eye cosmetically so that it *1184 would not turn outward and would look more “normal,” but at the time of trial none of the specialists he had seen had been able to repair the disfigurement of his eye.
On May 28, 2008, Trace and Gary sued Cody, Larry, and Becky in the Madison Circuit Court. The complaint alleged against Cody claims of negligence, wantonness, and assault and alleged that Cody was “strictly liable for causing injuries and damage[] to Trace.” The complaint also alleged claims of negligent and wanton supervision and negligent and wanton en-trustment against Larry and Becky. After Trace reached the age of majority, Gary was removed as a plaintiff and Trace continued the action as the sole plaintiff.
The case proceeded to a jury trial. At the close of Trace’s evidence, Larry and Becky moved for a JML as to all claims against them. The trial court granted their motion as to only the claim of wanton entrustment. Cody moved for a JML as to the strict-liability claim, but the trial court denied his motion. The trial court charged the jury on Trace’s claims of negligence, wantonness, assault, and strict liability as to Cody; the trial court further charged the jury on Trace’s claims of negligent entrustment, negligent supervision, and wanton supervision as to Larry and Becky.
The trial court’s charge to the jury stated, in pertinent part:
“Now, the disputed issues of fact to be decided by you in this case are the following: Number one, was Cody Bed-dingfield negligent in the manner he used bottle rockets back on the day in question. Number two, did Cody Bed-dingfield act in a wanton way in the manner he used bottle rockets back in the day in question. Did Cody Bedding-field assault Trace Linam. Is Cody Beddingfield strictly liable for causing
injury to the plaintiff, Trace Linam. Did Larry Beddingfield and/or Rebecca Beddingfield negligently or wantonly supervise Cody Beddingfield. Did Larry Beddingfield and/or Rebecca Bedding-field negligently entrust bottle rockets to Cody Beddingfield. As to each and all of the foregoing, as I’ve told you, the burden is upon the plaintiff, Trace Li-nam, to reasonably satisfy you by the evidence of the truthfulness of the matters and things claimed by him before he, as a plaintiff, would be entitled to recover.
[[Image here]]
“Now, I think you’ve heard me mention the term wantonness. Defendant Cody Beddingfield’s and/or defendant Larry Beddingfield’s and/or defendant Rebecca Beddingfield’s conduct is wanton if he or she or he and she consciously acts or fails to act with a reckless or conscious disregard of the rights or safety of others and he and/or she is aware that harm will likely or probably result.
[[Image here]]
“We’ve got more than one defendant in this case. So, in lawsuits such as this, I instruct you and charge you that all persons are jointly and severally liable for the proximate results of their negligence. Now, a parent’s negligent conduct, if any, does not bar, and in this case, would not bar Trace Linam from recovering from any or all of these defendants if Trace is otherwise entitled to recover from any or all of these defendants.
“Now, again, our plaintiff, Trace, says that the defendants, Larry Beddingfield and/or Rebecca Beddingfield, negligently supervised Cody Beddingfield, and as a result thereof, caused harm to Trace. If you are reasonably satisfied that Larry and/or Rebecca Beddingfield did not use reasonable care when supervising *1185 Cody Beddingfield and the failure to use reasonable care caused Trace harm, then Larry and/or Rebecca are responsible or is responsible for the harm.
[[Image here]]
“Now, the conduct of any one or other [or] all of these defendants caused harm if, one, the conduct naturally and probably brought about the harm; and two, the harm would not have happened without the conduct.
“Okay. Little more specific here. Again, Mr. Trace Linam’s claims are for negligent and/or wanton conduct [as] to any or all of these three defendants. Now, if Trace has not proved a particular claim, your verdict must be for the particular defendant as relates to that claim, defendant or defendants. And if he hasn’t proved it, you don’t get to consider damages. If Trace has proved a particular claim, then you must decide how much money to award Trace on that claim. That money, as you’ve heard, and I instruct you, that’s what the damages are, or is damages.
[[Image here]]
“Now, I mentioned a second or two ago about the verdict forms. Now, the fact that we’ve got verdict forms for you in no way is to indicate to you anything about what you should do or the fact that I might happen to read one before I read the other. We used to flip a coin sometimes to see which one I would read. But I will explain these to you.... Ladies and gentlemen, we’ve got two forms. If you should find for the defendants, there is a one-sentence form. It simply says, we the jury find in favor of the defendants and against the plaintiff on all claims. If you should find in favor of the plaintiff and against the defendants, here is what I was alluding to earlier, this form is going to list each defendant individually with a space to check off if you’re finding against one of those defendants. Then if you should find and award compensatory damages, there is a dollar sign and a line. Fill out that number, that foreperson, very, very clearly and legibly, if you get this far.
“If you get there with compensatory damages, you are entitled to consider punitive damages. As I told you, there is no obligation to. But if you do decide you want to consider and award punitive damages, it’s got the same thing. You would indicate as to which defendant or defendants, and then you would come down here and put in the dollar amount, again clearly and legibly.”
Trace’s counsel objected to the trial court’s refusal to give a requested jury instruction as to § 8-17-222, Ala.Code 1975.[4] Cody, Larry, and Becky’s counsel objected to the trial court’s giving jury charges as to the strict-liability claim against Cody and the negligent-entrustment, negligent-supervision, and wanton-supervision claims against Larry and Becky. Neither counsel objected to the verdict forms.
During deliberations, the jury sent a note to the trial court requesting that the court repeat the definitions of three terms, one of which was “wanton.” With the consent of all parties, the trial court again charged the jury as to those definitions. As to the term “wanton,” the trial court, stated:
“Okay. As to wanton, now, that claim has been made [as] to all three defen *1186 dants. Defendant, Cody Beddingfield’s and/or defendant Larry Beddingfield’s and/or defendant Rebecca Beddingfield’s conduct is wanton if he or she or he and she consciously acts or fails to act with a reckless or conscious disregard of the rights or safety of others and he or she, in any combination, is aware that harm will likely or probably result.”
The jury returned a verdict in favor of Trace and against Cody, Larry, and Becky, and awarded Trace compensatory damages of $600,000. The jury did not award punitive damages. The verdict form used by the jury states:
“We, the Jury, find in favor of the Plaintiff and against the following Defendants:
“x Jim Cody Beddingfield
“x Jimmy Larry Beddingfield
“x Rebecca M. Beddingfield
“We assess the Plaintiffs compensatory damages at $600,000.00.
“As to the claims for Punitive Damages, we, the Jury, find in favor of the Plaintiff and against the following Defendants!:]
“_ Jim Cody Beddingfield
“_ Jimmy Larry Beddingfield
“_ Rebecca M. Beddingfield
“We assess punitive damages against the indicated Defendant(s) in the amount of $_
“x As to the claims for Punitive Damages, we, the Jury, find in favor of all Defendants.”
On February 25, 2011, the trial court entered a judgment on the verdict. Cody, Larry, and Becky filed a postjudgment motion for a JML or, in the alternative, a motion for a new trial. Their motion was denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. Cody, Larry, and Becky then appealed.
II. Standard of Review
“When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmov-ant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala. 1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala. 2003).
III. Analysis
Larry and Becky first argue that they were entitled to a JML as to Trace’s claim of negligent entrustment. They argue that Trace failed to present any evidence of the elements that constitute a claim of negligent entrustment. In Ed *1187 wards v. Valentine, 926 So.2d 315, 319-20 (Ala.2005), this Court discussed the cause of action for negligent entrustment in the context of the alleged negligent entrustment of a motor vehicle:
“This Court has adopted Restatement (Second) of Torts § 390 (1965) as the law of this State in cases involving negligent entrustment. Keller v. Kiedinger, 389 So.2d 129, 132 (Ala.1980). According to § 390,
“ ‘[o]ne who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.’
“Otherwise stated, ‘ “[t]he essential ingredients of a cause of action for negligent entrustment are: (1) an entrustment; (2) to an incompetent; (3) with knowledge that he is incompetent; (4) proximate cause; and (5) damages.” ’ Halford v. Alamo Rent-A-Car, LLC, 921 So.2d 409, 412 (Ala.2005) (quoting Mason v. New, 475 So.2d 854, 856 (Ala. 1985) (emphasis omitted)).”
Trace argues that “[tjhere was sufficient evidence presented at trial from which the jury could find that [Cody] was incompetent, that [Larry] and [Becky] knew or should have known of his incompetence, and that the use of bottle rockets was permissive,” thus, he argues, establishing the elements of negligent entrustment against Larry and Becky.[5] Trace’s brief, at 18.
After reviewing the record in this case, we find no evidence of negligent entrustment as to Larry and Becky. Each parent testified that he or she did not purchase the fireworks that were present at the lake house and that he or she did not know that the fireworks were on the back porch of the lake house. The boys said that they found the fireworks on the back porch after they tired of fishing. Various witnesses testified that by the time the boys began to shoot the fireworks, Larry had gone to cut firewood and Becky had gone grocery shopping, so the only adult at the lake house while the boys were shooting fireworks was Jeff, who was preoccupied with his task of preparing the barbecue pit. The boys were not young children— they were 14 and 15 years old. Trace and Jay testified that they had fired bottle rockets before and that they were familiar with how to shoot fireworks. Although Cody denied ever shooting fireworks before that day at the lake, all three boys shot bottle rockets for approximately one hour without incident. There was no evidence indicating that Cody was known for reckless behavior, that he had ever deliberately tried to hurt someone, or that he had a disagreement with or disliked Trace so as to want to injure Trace.
When reviewing a ruling on a motion for a JML, we must determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination of the disputed issue. Ma *1188 con Cnty. Comm’n v. Sanders, 555 So.2d 1054 (Ala.1990). See also Sandoz, Inc. v. State, 100 So.3d 514, 526 (Ala.2012) (noting that, if evidence is insufficient to permit submission of a disputed factual issue to a jury, then that issue should not be submitted to the jury). We conclude that the evidence presented to the jury does not support Trace’s claim of negligent entrustment. Therefore, Larry and Becky were entitled to a JML as to the claim of negligent entrustment.
Larry and Becky also argue that they were entitled to a JML as to Trace’s claims of negligent supervision and wanton supervision. Larry and Becky argue in their brief that “[t]he tort of negligent/wanton [parental] supervision is not a developed tort in the state of Alabama and should not have been allowed to go to the jury.” Cody, Larry, and Becky’s brief (“the Beddingfields’ brief’), at 27. They also argue that “[i]f the caselaw does provide for such a claim, [Trace] did not meet the burden of proof required and [Larry and Becky] are entitled to a judgment as a matter of law in their favor.” Bedding-fields’ brief, at 27-28.
Larry and Becky first argue that Trace did not establish the elements of a claim of negligent supervision:
“[I]n this case, [Trace needed to show] evidence of the habitual tendencies of Cody to recklessly and wantonly use bottle rockets; that Larry and Becky Beddingfield knew, or should have known of such habitual tendencies; and that, as Cody’s parents, they failed to exercise supervision and control over him. As the evidence most clearly demonstrates, no such habitual tendencies were ever established by the evidence and no knowledge on the part of Larry and Becky of any such tendencies was ever shown.”
Beddingfields’ brief, at 32. They then argue that Trace did not ’establish a claim of wanton supervision:
“For the same reason that [Trace] failed to establish a claim of negligent parental supervision, [Trace] also failed to establish wanton parental supervision. Again, no evidence exists to show that Cody habitually misused bottle rockets and that his parents knew of such misuse.”
Beddingfields’ brief, at 33. Trace argues that he presented “substantial evidence from which the jury could reach a conclusion that [Larry] and [Becky] negligently and/or wantonly supervised [Cody] causing severe consequences.” Trace’s brief, at 31. He states:
“The evidence not only proved that [Larry] and [Becky] negligently supervised their son, it also showed that they wantonly supervised their son by acting with reckless disregard of the rights of others who were invited to their lake house or around their son.”
Trace’s brief, at 32.
Trace argues that in Standifer v. Pate, 291 Ala. 434, 282 So.2d 261 (1973), this Court “recognized a cause of action for negligent supervision” and “recognized that the duty is to supervise children properly.” Trace’s brief, at 29-30. This case, however, is distinguishable from Standifer. Standifer involved a babysitter’s voluntary undertaking to supervise a young child who, while in the babysitter’s care, pulled a pan of hot grease off a countertop, injuring himself. The plaintiff in Standifer was the injured child, who sued the person who had undertaken a duty to supervise. Here, the injured plaintiff, Trace, has alleged that Larry and Becky had a duty to supervise their own child, who is a defendant along with his parents.
*1189 This Court’s research has found few reported cases, either in Alabama or in other states, that have recognized a claim of negligent or wanton supervision involving a parent’s supervision of his or her child.[6] There are a number of Alabama cases involving claims of negligent supervision, but almost all those cases allege the negligent supervision of an employee by an employer. One case, Land v. Niehaus, 340 So.2d 760 (Ala.1976), presented claims of negligent entrustment and negligent supervision against the father of a 17-year-old boy, who, while riding his motorcycle in a reckless manner, struck and severely injured a young child. Evidence in Land revealed that the father knew about his son’s reckless driving habits and numerous traffic violations but did nothing to take away the son’s motorcycle or driving privileges. The Court in Land focused primarily on the negligent-entrustment claim against the father, but the Court also stated in dicta that “[t]he issue, presented by Count II, of negligent failure to control or discipline his child also presents a question of fact for the jury. The evidence was controverted and there was substantial evidence from which the jury could reasonably reach its conclusion, as it did.” 340 So.2d at 762. Nothing in Land indicates that the Court was presented with or considered the question whether Alabama recognizes negligent parental supervision as a cognizable cause of action. This Court’s research has not found any Alabama case that sets out the elements of a claim of negligent supervision that does not involve an employer/employee relationship, nor has our research found any case that describes a claim of wanton supervision. We decline to extend our holdings in negligent-supervision cases to recognize a cause of action based on a parent’s negligence or wantonness in supervising his or her own child. Therefore, Larry and Becky were entitled to a JML as to the claims of negligent supervision and wanton supervision.
We next address Cody’s argument that he was entitled to a JML as to Trace’s claim that he is strictly liable for Trace’s injury. This Court discussed the rule of strict liability in Harper v. Regency Development Co., 399 So.2d 248 (Ala.1981).
“Adherence to the strict liability doctrine has been approved by the Restatement (Second) of Torts (1977), § 519 of which provides:
“ ‘(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
“ ‘(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.’
[[Image here]]
“AN ABNORMALLY DANGEROUS ACTIVITY
“The Restatement (Second) of Torts, § 520 (1977), sets forth the following factors to be considered in determining whether an activity is abnormally dangerous:
*1190 “ ‘(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
“ ‘(b) likelihood that the harm that results from it will be great;
“ ‘(c) inability to eliminate the risk by the exercise of reasonable care;
“ ‘(d) extent to which the activity is not a matter of common usage;
“ ‘(e) inappropriateness of the activity to the place where it is carried on; and
“ ‘(f) extent to which its value to the community is outweighed by its dangerous attributes.’
“It is apparent that liability for an abnormally dangerous activity arises out of the intrinsic danger of the ultrahazar-dous activity itself and the risk of harm it creates to those in the vicinity. Restatement (Second) of Torts, § 519, Comment d (1977). The basis for liability is that one who for his own purposes creates an abnormal risk of harm to his neighbors must be responsible for relieving that harm when in fact it does occur. Id.
“The rule of strict liability, however, only applies to that harm which is within the scope of the abnormal risk upon which liability is based. In other words, one who detonates explosives on his own property may be responsible for the risk of harm to persons or property in the vicinity. If, however, no explosion takes place, but someone trips over the dynamite and breaks a leg, strict liability will not apply. Restatement (Second) of Torts, § 519, Comment e (1977).”
399 So.2d at 252-53. Cody states in his brief that no Alabama caselaw has held that shooting bottle rockets is an abnormally dangerous activity such that strict liability would apply to his conduct, and this Court’s research has not found a case so holding.[7] Trace argues in response that in Harper this Court determined that whether the use of explosives was an abnormally dangerous activity was a question for the jury.
Trace is correct that ordinarily the question whether a certain activity is abnormally dangerous is a jury question. However, the evidence Trace presented was insufficient to prove that shooting ordinary consumer fireworks is an abnormally dangerous activity. Among other things, the fireworks that caused Trace’s injury are commonly used. Cody points out that many of the jurors indicated during voir dire that they had shot such fireworks. Furthermore, much of the risk involved with ordinary consumer fireworks can be eliminated by the use of reasonable care, as evidenced by the warning labels introduced into evidence and by Trace’s arguments as to Cody’s alleged negligence in using the fireworks.
Trace also states that “the State of Washington has applied strict liability to fireworks displays” and cites Klein v. Pyrodyne Corp., 117 Wash.2d 1, 810 P.2d 917 (1991). Trace’s brief, at 36. Klein, however, does not support Trace’s argument. In Klein, a pyrotechnic company set off a large display of fireworks near a large crowd of spectators, injuring some of the spectators; the Supreme Court of Washington found that setting off public fireworks displays was not an activity “of common usage” and that it presented a high risk of serious bodily injury or prop *1191 erty damage. The Court concluded that conducting commercial public fireworks displays before large crowds was an abnormally dangerous activity justifying the imposition of strict liability. In the case before us, however, Cody was not conducting a large public fireworks display; rather, all three boys were shooting bottle rockets on private property near a lake. This is not the type of activity that the strict-liability rule was designed to cover. Because the evidence presented to the jury was not sufficient to prove that the use of ordinary consumer fireworks in this case constituted an abnormally dangerous activity, Trace’s claim of strict liability against Cody should not have been presented to the jury. Therefore, Cody was entitled to a JML as to the claim of strict liability.
Because the strict-liability claim against Cody was improperly submitted to the jury, we have in this appeal a good-count/ bad-count situation as to Cody analogous to the situation in Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981). In Aspinwall, this Court held:
“[I]f a complaint has more than one count and the defendant believes that the evidence is not sufficient to support one or more of those counts, he must challenge this by motion for directed verdict [now a motion for a judgment as a matter of law, see Rule 50, Ala. R. Civ. P.], specifying the count which is not supported by evidence and detailing with specificity the grounds upon which the particular count is not supported by the evidence. If this is not done and all counts go to the jury and a general verdict is returned, the court will presume that the verdict was returned on a valid count.”
405 So.2d at 138 (opinion on application for rehearing). See also Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1165 (Ala.2003); Life Ins. Co. of Georgia v. Smith, 719 So.2d 797 (Ala.1998). Here, counsel for Cody submitted the required motions for a JML specifically directed to the strict-liability claim; the trial court denied those motions. We cannot assume that the jury’s verdict was based only on those of Trace’s claims against Cody that were properly submitted to the jury. Accordingly, we reverse the judgment based on the jury verdict for Trace and remand the cause for a new trial as to Trace’s claims of negligence, wantonness, and assault against Cody.
IV. Conclusion
We reverse the judgment entered on the jury verdict. As to the claims of negligent entrustment, negligent supervision, and wanton supervision against Larry and Becky, we render a judgment in their favor. As to the claims against Cody, we render a judgment in his favor on the strict-liability claim and as to the remaining claims we remand the case for a new trial consistent with this opinion. Because we conclude that Cody is entitled to a new trial, we pretermit consideration of the other arguments made by the parties.
REVERSED; JUDGMENT RENDERED AS TO JIMMY LARRY BED-DINGFIELD AND REBECCA M. BED-DINGFIELD AND AS TO JIM CODY BEDDINGFIELD ON THE STRICT-LIABILITY CLAIM; AND CAUSE REMANDED FOR A NEW TRIAL AS TO THE REMAINING CLAIMS AGAINST JIM CODY BEDDINGFIELD.
MOORE, C.J., and STUART, BOLIN, MURDOCK, WISE, and BRYAN, JJ„ concur.
PARKER, J., concurs specially.

. Because five of the nine individuals involved in this case have the last name Beddingfield, we will refer to all those involved by their first or middle names.

. Cody testified that a cousin, Kevin Rose, had been at the lake house earlier on July 2 and that Kevin had previously brought fireworks to the lake house, but there is no evidence indicating that Kevin brought the fireworks the boys found on the back porch.

. Jay and Trace testified that they had spent the night with Cody at Larry and Becky's house in Huntsville several months before the party at Lake Guntersville. Jay and Trace testified that, on that occasion, Cody took them to a shed in his backyard and showed them a long piece of PVC pipe. Both Jay and Trace said that Cody told them he had used the pipe to launch bottle rockets that he aimed at cows. Jay said he had shot bottle rockets with Cody at Larry and Becky’s house in Huntsville at another time and that Cody had aimed a bottle rocket at a cow on that occasion. Jay and Trace testified that Larry and Becky were at home when they spent the night, but neither Larry nor Becky remembered ever meeting Trace before the day on which he was injured. Neither Larry nor Becky was present when Cody showed the piece of pipe to Jay and Trace, and they were unaware that he had ever shot bottle rockets at cows. Cody testified that he did not recall shooting fireworks before July 2. He also stated that he did not remember meeting Trace before July 2.

. Section 8-17-222, Ala.Code 1975, states, in pertinent part:
"It shall be unlawful to offer for sale or to sell any fireworks to children under the age of 16 years unless accompanied by an adult or to any intoxicated or irresponsible per-son_ No person shall ... place or throw any ignited article of fireworks ... at or near any person or group of people."

. Citing Brown v. Vanity Fair Mitts, Inc., 291 Ala. 80, 83, 277 So.2d 893, 896 (1973), Trace also argues that the "all embracing term 'chattel' used in the Restatement (Second) of Torts is not limited to automobiles.” Trace’s brief, at 17-18. Trace is correct that the word "chattel” as used in the Restatement (Second) of Torts is not limited to automobiles, but we note that the vast majority of cases in Alabama and in other states discussing a claim of negligent entrustment as to a parent involve a parent's entrustment of a motor vehicle or a firearm to a minor.

. Other states have recognized such claims of negligent supervision. See, e.g., Williamson v. Daniels, 748 So.2d 754 (Miss.1999) (recognizing the cognizability of a negligent-supervision claim as to a parent but affirming a directed verdict for the mother on the basis that she acted reasonably in attempting to control her 15-year-old son); Crisafulli v. Bass, 308 Mont. 40, 38 P.3d 842 (2001) (reversing a summary judgment for parents on negligent-supervision-of-child claim where child rode bicycle into plaintiff, adopting § 316 Restatement (Second) of Torts).

. Most Alabama cases discussing strict liability have involved commercial blasting. See, e.g., Birmingham Coal & Coke Co. v. Johnson, 10 So.3d 993, 997 (Ala.2008) (plaintiffs proved by substantial evidence that explosives were used under abnormally dangerous conditions). But see Fike v. Peace, 964 So.2d 651 (Ala.2007) (shipping of an oversized load is not an inherently dangerous activity).